## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **TIMOTHY JOSEPH SCHITTLER,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 7:20CV00387 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **CHAD KILGORE, ET AL.,** | ) | JUDGE JAMES P. JONES |
| | ) | |
| Defendants. | ) | |

*Timothy Joseph Schittler, Pro Se Plaintiff; Jason R. Whiting, JOHNSON, AYERS & MATTHEWS, P.L.C., Roanoke, Virginia, for Defendant Kilgore; Taylor D. Brewer, MORAN REEVES CONN PC, Richmond, Virginia, for Defendants Dooley and Carlton.*

The plaintiff, Timothy Joseph Schittler, a Virginia inmate proceeding pro se, filed this civil rights action under 42 U.S.C. § 1983, alleging that the defendants denied him access to necessary mental health treatment between June 2019 and August 24, 2020.  The defendants have filed dispositive motions which I find must be granted in part and denied in part.

### I. BACKGROUND.

#### A. Plaintiff's Allegations.

At the time Schittler's claims arose, he was confined at the Southwest Virginia Regional Jail ("SWVRJ") facility in Abingdon, Virginia.  Schittler's Complaint, as

amended,[1] taken in the light most favorable to him, alleges the following facts.  On

August 19, 2019, defendant Dooley, a Qualified Mental Health Professional

("QMHP"), conducted a mental health assessment of Schittler, which included

questions about his prior mental health treatments, diagnoses, and medications.

Schittler told Dooley that he had been in the United States Army, had served two

combat tours in Iraq between 2008 and 2012, suffered from "PTSD [Post Traumatic

Stress Disorder], High Anxiety and very depressed moments."  Compl. 3, ECF No.

1.  Dooley said he did not believe Schittler's story, since Dooley had friends who

had also served in Iraq, who did not "steal shit" after they returned to civilian life.

*Id.*  Dooley also told him that the timeline for his admitted prior drug use seemed

like lying.  When Schittler said he was from Reading, Pennsylvania, Dooley called

him a "Damned Yankee."  *Id.* at 4.  Schittler became agitated and asked when he

could see the doctor.   Because of what Dooley described as Schittler's

"aggressiveness," he placed Schittler on fifteen-minute suicide watch.  *Id.*  Although

Schittler signed release forms for jail officials to obtain his military records and

medical records from the Pennsylvania Department of Corrections, county jails, and

---

[1]   After filing the initial, verified Complaint in July 2020, Schittler filed and
incorporated by reference two sets of photocopied medical request forms and other
documents, ECF Nos. 8 and 12, and a motion seeking to amend his demand for monetary
damages, ECF No. 49, which the court granted.  Schittler also filed other submissions and
responses to the defendants' motions, ECF Nos. 23, 48, 58, and 65, which I will construe
as supplements to the allegations of the Complaint.

pharmacies, he was repeatedly told by the SWVRJ staff that he did not qualify for mental health services or that they needed more information.

From August 2019 until mid-August 2020, Schittler filed more than twenty-five requests or grievances for mental health treatment, stating his mental health issues and the medication that he had previously been prescribed and believed he needed, Wellbutrin. Schittler "personally talked and was in correspondence with" Howard Carlton, the head of the medical unit at the facility, about his need for mental health treatment. Mem. Opp'n 1, ECF No. 48. Schittler "made Howard Carlton aware" of his military service and his previous "verifiable p[re]scriptions," and "asked for a new assessment" with Carlton present as "a liaison" between Schittler and Dooley. *Id.*

In April 2020, Schittler wrote a personal letter to defendant Chad Kilgore, the Jail Administrator, voicing several complaints about jail conditions. Among other things, Schittler stated that he needed mental health care and asked for a second mental health assessment.[2] In response to his letter, Schittler was placed in

---

[2] Specifically, Schittler's letter to defendant Kilgore stated that he was being denied mental health care completely; he said Dooley's initial assessment had not gone well and asked for another one, with someone else present; and he complained that staff had "lied . . . about the department not being able to obtain [his] medical records" from former providers. Mem. Supp. Mot. Summ. J., Kilgore Decl. Ex. A at 3, ECF No. 39-2. He declared, "I need my mental health drugs." *Id.* at 4.

segregation, where he remained in his cell for all but one hour per day.  He was not provided with mental health treatment while confined in the Abingdon jail facility.

In late August 2020, Schittler was transferred to the SWVRJ facility in Haysi, Virginia.  When he sought mental health care there, a different QMHP assessed his mental health needs.  By the end of October 2020, she had scheduled Schittler for a telemed examination by the psychiatrist who serves the needs of inmates at all SWVRJ facilities.  The doctor prescribed Wellbutrin and other mental health medications for Schittler.

### B.  Defendants' Evidence.

QMHP Dooley states that he is "contracted through Mediko Correctional Healthcare to facilitate psychiatric care and treatment of inmates at [SWVRJ] facilities, including Abingdon." Mem. Supp. Mot. Summ. J.,  Dooley Aff. ¶ 2, ECF No. 34-1.  He is "trained to assess and recognize mental disorders, although [he is] not a physician and cannot make diagnoses.  [He is] also trained to triage inmates' mental health concerns.  Based on [his] assessments, [he] refer[s] the inmates to the facility psychiatrist as needed based on the criteria they set." *Id.*

According to Schittler's medical records and Dooley's own recollections, Schittler's intake screening at the Abingdon facility was performed on July 1, 2019. At that time, Schittler "denied he was taking any medications and he denied any mental health history." *Id.* ¶ 5.  On July 4, 2019, a nurse reported to Schittler's cell

and documented that he "was crying, flushed, and rubbing his head"; he "reported

issues with anxiety" and "was moved to the medical unit for observation."  *Id.* ¶ 6.

Dooley first saw Schittler on July 5, 2019.  Dooley's assessment was that Schittler

had suffered a panic attack.  Schittler "denied any ongoing symptoms of anxiety or

panic attack and relayed he had swallowed a gram of meth prior to his incarceration

and woke up in a panic."  *Id.* ¶ 7.  He denied thoughts of suicide, self-harm, or

homicide, and Dooley released him from medical observation.

Dooley saw Schittler again on August 16, 2019.  The inmate stated that he

wanted to resume taking Wellbutrin, an antidepressant and smoking cessation aid.

He stated that he had been taking this medication before his incarceration and signed

a form to allow release of medical records.  Dooley placed him on the list for a

mental health assessment.  Dooley informed Schittler that the psychiatrist typically

does not prescribe Wellbutrin, because of its addictive properties and potential for

its abuse.

On August 19, 2019, Dooley performed a mental health assessment of

Schittler.  Dooley reports that Schittler was "annoyed and combative," and

uncooperative during the assessment.  *Id.* ¶ 9.  Dooley told Schittler that he could

not be referred to the psychiatrist unless he cooperated with the assessment

procedures, but Schittler "continued to be combative, hostile, and sarcastic."  *Id.*

Dooley repeated that the psychiatrist would likely prescribe a less addictive

antidepressant than Wellbutrin if warranted.  Schittler became "very hostile and demanded that he be sent to medical observation. . . .  Based upon his refusal to cooperate and his seeming inability to calm himself, [Dooley] ordered that he be placed on 15-minute suicide watch."  *Id.*  Dooley denies that he called Schittler a Yankee or accused him of lying.  When Dooley evaluated Schittler the following day, the inmate said that he was ready to cooperate with security staff and denied any thoughts of suicide or homicide.  Dooley then released him from suicide watch and did not personally see or interact with Schittler again.

On September 5, 2019, Dooley reviewed records received from Schittler's prior pharmacy; they indicated that he had been prescribed Wellbutrin seven years earlier for smoking cessation.  Dooley reports that Schittler "had never been prescribed Wellbutrin or any other psychotropic medication for mental health issues."  *Id.* ¶ 12.  Based on this information and his assessments of Schittler, Dooley concluded that the inmate did not need a referral to the psychiatrist for medication.

After September 5, 2019, Dooley did not review Schittler's medical chart and was never asked to re-evaluate him for mental health concerns.  Dooley states that the pharmacy records for which Schittler signed a medical release form did not indicate that he had any mental health history and that he "never provided the names of any other mental health care providers who might have treated him."  *Id.* ¶ 14. Dooley reports that to his knowledge, "Schittler did not seek and did not merit mental

health treatment at Abingdon at any time after [their] early exchanges in August 2019." *Id.*

Defendant Kilgore states that as the Jail Administrator, he is a custodian of records for the facility, but he is not a medical provider or a supervisor of such providers who serve the inmates there. Rather, MEDIKO, a private company, provides all medical services to inmates. After receiving Schittler's letter in April 2020, Kilgore placed him in "special administrative housing (the 'SHU') because he threatened to disrupt electrical and security systems in the Jail by popping outlets unless . . . the inmates [were] provided with tattoo ink." Mem. Supp. Mot. Summ. J., Kilgore Decl. ¶ 10, ECF No. 39-1; Ex. A at 4, ECF No. 39-2.

Kilgore also states that as Jail Administrator, he does not receive or respond to inmate grievances or grievance appeals, although he does sometimes respond to inmates by letter through the Postal Service. After receiving Schittler's letter in April 2020, Kilgore wrote back to him, explaining that he was placed in the SHU because his letter threatened to "act out by destroying outlets and other systems of the facility," creating a "major security issue that [would] not be tolerated. *Id.* at Ex. C, ECF No. 39-4. Kilgore's letter also indicated, "[Y]ou have stated you are filing a 1983. In doing so it is now up to you to get an attorney to ask for the information that you want provided through the courts. We will not give you any information, unless ordered by the courts, pertaining to security or medical." *Id.*

## C. Claims and Motions.

Liberally construing Schittler's Complaint as amended, he contends that (a) Dooley slandered his character; (b) Dooley denied him necessary mental health care because of his birthplace and his military service; (c) Kilgore punished him with lockdown for exercising his right to free speech; and (d) Dooley, Carlton, and Kilgore acted with deliberate indifference and negligence to his serious mental health needs. As relief, Schittler seeks monetary damages. Carlton and Kilgore have filed motions to dismiss, and Kilgore and Dooley have filed motions for summary judgment. Schittler has responded to all these motions, making them ripe for disposition.

## II. DISCUSSION.

## A. The Standards of Review.

A district court should dismiss a complaint under Rule 12(b)(6) if, accepting all well-pleaded allegations in the complaint as true and drawing all reasonable factual inferences in the plaintiff's favor, the complaint does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic

recitation of the elements of a cause of action will not do." *Id.* at 555.[3]  Moreover,

a court need not "accept the legal conclusions drawn from the facts" or "accept as

true unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore*

*Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000).

A court should grant summary judgment "if the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law." Fed. R. Civ. P. 56(a).  A genuine dispute exists "if the evidence

is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

> In considering a motion for summary judgment, the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party.  The plaintiff is entitled to have the credibility of all his evidence presumed.  The party seeking summary judgment has the initial burden to show absence of evidence to support the nonmoving party's case.  The opposing party must demonstrate that a triable issue of fact exists; he may not rest upon mere allegations or denials.  A mere scintilla of evidence supporting the case is insufficient.

*Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).

Dooley and Kilgore have filed supporting affidavits, a declaration, and

documentation.  Accordingly, to avoid summary judgment, Schittler must present

sufficient evidence that could carry the burden of proof of his claims at trial.  *See id.*

He "may not rest upon the mere allegations or denials of his pleading, but must set

---

[3]  I have omitted internal quotation marks, citations, and alterations here and throughout this Opinion, unless otherwise noted.

forth specific facts showing that there is a genuine [factual] issue for trial" on which

the jury could find in his favor. *Anderson*, 477 U.S. at 248.

A pro se litigant's verified complaint must be considered as an affidavit and

may, standing alone, defeat a motion for summary judgment when the allegations

contained therein are based on personal knowledge. *Williams v. Griffin*, 952 F.2d

820, 823 (4th Cir. 1991). "[U]nsupported speculation is not sufficient to defeat a

summary judgment motion," however. *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872,

875 (4th Cir. 1992).

## B.  Slander and Discrimination.

To state a claim under § 1983, a plaintiff must allege "the violation of a right

secured by the Constitution and laws of the United States, and must show that the

alleged deprivation was committed by a person acting under color of state law."

*West v. Atkins*, 487 U.S. 42, 48 (1988).  To hold an official liable under § 1983, the

plaintiff must state facts to affirmatively show that the officer acted personally to

deprive the plaintiff of, or violate, his constitutional rights. *Vinnedge v. Gibbs*, 550

F.2d 926, 928 (4th Cir. 1977).

As an initial matter, Schittler's slander or defamation claim is only actionable

under Virginia tort laws. *See Paul v. Davis*, 424 U.S. 693, 712 (1976) (finding that

defamation is not sufficient to state §1983 claim absent showing that it caused injury

to constitutionally protected right).  Section 1983 provides a vehicle for vindication

of rights arising under the constitution or other federal laws, not rights arising under state laws. *Weller v. Dep't of Social Servs.*, 901 F.2d 387 (4th Cir. 1990). Schittler does not demonstrate that Kilgore's alleged name-calling and belittling violated his constitutional rights in any way. *See, e.g., Morrison v. Martin*, 755 F. Supp. 683, 687 (E.D.N.C.) ("Words by themselves do not state a constitutional claim, without regard to their nature."), *aff'd*, 917 F.2d 1302 (4th Cir. 1990) (unpublished). Accordingly, I do not find that the assertion of slander is actionable under §1983 and will grant Dooley's motion as to that portion of the § 1983 action. I also decline to exercise supplemental jurisdiction over Schittler's state law claim of slander against Dooley. *See* 28 U.S.C. § 1367(c).

I further conclude that Kilgore has not stated facts sufficient to present a potential claim that Dooley discriminated against him because of his birthplace and veteran status.

> "The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S. Ct. 1073, 145 L.Ed.2d 1060 (2000) (internal quotation marks and alteration omitted). "To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). We then consider "whether the disparity in treatment can be justified under the requisite level of scrutiny." *Id.* "[T]he Supreme Court has recognized the validity of 'class of one' Equal Protection claims, 'where the plaintiff alleges that she has been

> intentionally treated differently from others similarly situated and that
> there is no rational basis for the difference in treatment.'"

*King v. Rubenstein*, 825 F.3d 206, 220 (4th Cir. 2016). Schittler's allegations do not

mention any other inmates similarly situated in this case to whom Dooley did

provide mental health treatment. Without this critical element of different treatment,

Schittler's claim here is simply verbal abuse. While comments such as those Dooley

allegedly made to Schittler are disturbing and unprofessional, without more, they do

not implicate his constitutionally protected rights. Allegations of mere verbal

harassment by prison officials simply do not state any constitutional claim. *Henslee*

*v. Lewis*, 153 F. App'x 178, 180 (4th Cir. 2005) (unpublished) (citing *Collins v.*

*Cundy*, 603 F.2d 825, 827 (10th Cir. 1979)). Thus, I will grant Dooley's motion for

summary judgment as to any claim of discriminatory treatment.

## C. Retaliation.

Kilgore moves for dismissal or summary judgment as to Schittler's claim that

Kilgore retaliated against him for writing a letter complaining of various jail

conditions and denial of mental health treatment. On the full record, I conclude that

Kilgore is entitled to summary judgment on this claim.

To state a claim for retaliation under § 1983, a plaintiff must allege that (1) he

engaged in a protected First Amendment activity, (2) the defendant took some action

that adversely affected his First Amendment rights, and (3) there was a causal

relationship between his protected activity and the defendant's conduct. *See Martin*

*v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017).  Inmates have a clearly established a

"First Amendment right to be free from retaliation for filing a grievance."  *Booker*

*v. S.C. Dep't of Corr.*, 855 F.3d 533, 546 (4th Cir. 2017).

Applying this analysis, Schittler has alleged that he exercised his First

Amendment rights by writing his complaint letter to Kilgore.  In response to that

letter, Kilgore took an adverse action by imposing segregated confinement on him,

an action that, in turn, could have had a chilling effect on Schittler's future exercise

of his free speech rights.  *Constantine v. Rectors & Visitors of George Mason Univ.*,

411 F.3d 474, 500 (4th Cir. 2005) (defining adverse action for retaliation claim as

one that "would likely deter a person of ordinary firmness from the exercise of First

Amendment rights").   As such, I conclude that Schittler has met his burden of

alleging facts to meet the first three elements of a § 1983 retaliation claim under

*Martin*.

"Once a plaintiff establishes his protected conduct was a substantial or

motivating factor in the defendant's decision to take adverse action," the burden of

proof falls to the defendant.  *Martin v. Duffy*, 977 F.3d 294, 301 (4th Cir. 2020).

Often, as here, retaliation claims stem from situations where the inmate has engaged

in both protected conduct and misconduct.  *Id.*  If the official demonstrates that he

would have taken the same actions had the inmate engaged only in misconduct,

"courts logically infer legitimate reasons caused the adverse action, not retaliatory ones." *Id.* at 302.

In this case, it is undisputed that Schittler's letter to Kilgore, while making a mental health care complaint, also included an express threat to sabotage prison outlets and security systems if officials failed to provide tattoo ink. *See* Kilgore Decl. Ex. A, ECF No. 39-2. Schittler also offers no evidence in contradiction to Kilgore's affidavit, stating that the written threat portion of the letter triggered Schittler's trip to segregation to further the security needs of the facility. On this record, I conclude that Kilgore has demonstrated a legitimate and nonretaliatory reason for Schittler's housing reassignment that is unrelated to the portion of his letter asking for mental health care. Accordingly, I find no genuine issue of material fact on which Schittler could persuade a fact finder to rule in his favor on the retaliation claim. Thus, Kilgore is entitled to summary judgment as a matter of law, and I will grant his motion as to this claim.

D.  Denial of Mental Health Treatment.

Schittler alleges that all three defendants knew of his need for mental health treatment and denied or failed to ensure him access to it, in violation of his rights under the Eighth Amendment. This amendment's protections against cruel and unusual punishment include a right to the medical care necessary to address an inmate's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976).

Specifically, a prison official's "deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).

The medical need portion of this legal standard is objective. It requires facts showing that the inmate's medical condition is "serious — one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* The deliberate indifference portion of the constitutional standard is subjective. The plaintiff must show that each defendant knew of and disregarded an excessive risk to inmate safety or health. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). It is not sufficient to show that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk of harm posed by the official's action or inaction. *Jackson*, 775 F.3d at 178. "This deliberate indifference standard is not satisfied by a showing of mere negligence, a mere error of judgment or inadvertent failure to provide medical care, or mere disagreement concerning questions of medical judgment." *Germain v. Shearin*, 531 F. App'x 392, 395 (4th Cir. 2013) (unpublished); *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977) ("[T]he essential test is one of medical necessity and not simply that which may be considered merely desirable"). On the other hand, inmates are

entitled to psychological or psychiatric treatment if a physician or other health care provider, exercising ordinary skill and care at the time of observation, concludes with reasonable medical certainty (1) that the prisoner's symptoms evidence a serious disease or injury; (2) that such disease or injury is curable or may be substantially alleviated; and (3) that the potential for harm to the prisoner by reason of delay or the denial of care would be substantial.

*Id.* at 47.

Schittler's submissions allege that between August 2019 and August 2020, he made Dooley, Kilgore, and Carlton aware, verbally and through request forms or grievances, that he needed and was not receiving any mental health treatment at the Abingdon facility.  I conclude that Schittler's submissions are sufficient to state Eighth Amendment claims against all three defendants and that genuine issues of material fact remain in dispute for trial.

Schittler contends that Dooley denied him mental health treatment at the time of the initial assessment on August 19, 2019.  Taking the evidence in the light most favorable to Schittler, he filed multiple mental health requests in early August 2019 for mental health care and provided the names of several previous mental health care providers.  Additional Evid. 3, ECF No. 8.  Schittler told Dooley that he was a combat veteran and former prisoner, who had previously been prescribed Wellbutrin for mental health issues, including anxiety and depression, and that he was having trouble again with these issues.  He had also recently experienced what Dooley himself diagnosed as a panic attack, and he became so agitated during the mental

health assessment that Dooley placed him on suicide watch. Yet, Dooley allegedly

decided that Schittler did not warrant a psychiatric examination in August 2019,

based on only one set of pharmacy records and on Dooley's own personal feelings

about him and his background, rather than on the inmate's mental health symptoms

and needs. Of course, Dooley maintains that his decisions were based solely on the

evidence he observed, the lack of additional past treatment records, and his mental

health training. I find material factual disputes here that cannot be determined on

summary judgment. Accordingly, I will deny Dooley's motion as to this aspect of

Schittler's claims.

Schittler also contends that all three of the defendants knew for months after

the August 19, 2019 mental health assessment— through verbal complaints, mental

health requests, medical grievances, and the letter to Kilgore — that he continued to

ask for mental health care at the Abingdon facility, without success. Yet none of

them took steps to have Schittler reassessed for mental health treatment needs. After

Schittler's transfer to a different facility in August 2020, within weeks, he was

reassessed and received mental health medications.

Schittler is not simply disagreeing with Dooley's initial assessment, on which

the defendants were entitled to rely for some period of time. *Miltier v. Beorn*, 896

F.2d 848, 851 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511

U.S. at 837 (holding that non-medical supervisory prison officials are entitled to rely

on professional judgment of trained medical personnel).   He claims that the assessment was based on reasons unrelated to Dooley's medical judgment.  Schittler is also not claiming that Carlton and Kilgore should be liable for Dooley's actions through a theory of respondeat superior based merely on their supervisory positions. "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Rather, Schittler is alleging that each of the three defendants personally knew of his mental health complaints and lack of treatment after August 19, 2019, but failed to act to ensure that he received another mental health assessment and treatment indicated as necessary through that second assessment.

More specifically, Schittler contends that his complaints of continuing mental health needs warranted a second assessment for such care, which he expressly requested in his written requests and in his letter to Kilgore.  He implies that Carlton and Dooley must have received, reviewed, or had notice of his many mental health requests and medical grievances, and nothing in the record contradicts that contention.  Indeed, Carlton's name appears on one of the forms as a respondent, and Dooley offers no explanation for his purported lack of knowledge of these continuing requests from Schittler for mental health assessment.  Schittler also alleges that he informed Carlton verbally of his past prescriptions, his military

service, and his problems with the initial mental health assessment, and he specifically asked for a second assessment and to receive mental health medications. Schittler's letter to Kilgore informed that supervisory official that he had previously been prescribed mental health medications, that he had difficulty during the initial screening, and that after months of asking for care, he had not received a reevaluation for treatment.   I cannot agree with Kilgore's assertion that a jail supervisor's constitutional obligation to ensure jail inmates receive necessary care for their serious medical and mental health needs is completely fulfilled with the jail's contractual arrangement with MEDIKO to provide medical professionals to assess and provide for inmates' medical and mental health needs.  Such an administrator must also ensure that the contractors are not denying inmates the medical and mental health care these professionals have been hired to provide.  *See, e.g.*, *Shakka v. Smith*, 71 F.3d 162, 167 (4th Cir. 1995) (finding that evidence showing warden or security chief knew of and deliberately ignored inmate's unfulfilled medical need for wheelchair could support finding of deliberate indifference); *see also Estelle*, 429 U.S. at 104–05 (holding that nonmedical officials evince deliberate indifference by acting intentionally to delay or deny the prisoner access to medical care).

I conclude that the allegations and evidence, taken in the light most favorable to Schittler, state plausible claims of deliberate indifference against these defendants and that the record establishes material disputes of fact that survive summary

judgment.    Therefore, I will deny the motions to dismiss and the motions for summary judgment as to Schittler's claims that the defendants denied him access to mental health care between August 19, 2019, and August 2020.

### III.  CONCLUSION.

In accordance with the foregoing, it is **ORDERED** as follows:

1.  The defendants' motions, ECF Nos. 30, 33, 36, and 38, are GRANTED IN PART AND DENIED IN PART; the motions are GRANTED as to the plaintiff's claims of slander, discrimination, and retaliation; and the motions are DENIED as to the plaintiff's § 1983 claims of deliberate indifference to serious medical needs for mental health treatment.

2.  The clerk is DIRECTED to schedule this matter for a jury trial in the United States Courthouse in Abingdon, Virginia, on the remaining claims.

ENTER:   September 22, 2021

/s/  JAMES P. JONES
Senior United States District Judge